## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| AMERICAN HOME MORTGAGE, | ) Case No. 07-11047 (CSS) |
| HOLDINGS, INC., a Delaware Corporation, | ) Jointly Administered |
| et al., | ) |
| Debtors. | ) |
| _____ | ) |
| STEVEN D. SASS, AS PLAN TRUSTEE of the | ) |
| AMERICAN HOME MORTGAGE PLAN | ) |
| TRUST, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Adv. Proc. No. 11-51851 (CSS) |
| | ) |
| BARCLAYS BANK PLC and BARCLAYS | ) |
| CAPITAL, INC., | ) |
| | ) |
| Defendants. | ) |

### <u>OPINION</u>[1]

| | |
|---|---|
| MORRIS, NICHOLS, ARSHT | YOUNG, CONAWAY, STARGATT |
| & TUNNELL LLP | & TAYLOR, LLP |
| Gregory W. Werkheiser | Sean M. Beach |
| Erin R. Fay | Michael S. Neilburg |
| 1201 North Market Street | 1000 North King Street – Rodney Square |
| Wilmington, DE  19899 | Wilmington, DE  19899 |
| -and- | -and- |
| LINKLATERS LLP | HAN & HESSEN LLP |
| Lance Croffoot-Suede | Mark S. Indelicato |
| Paul Hessler | Edward L. Schnitzer |
| 1345 Avenue of the Americas | 488 Madison Avenue |
| New York, NY  10105 | New York, NY  10022 |
| | |
| COUNSEL FOR DEFENDANTS | COUNSEL FOR PLAINTIFF |

---

[1] "The court is not required to state findings or conclusions when ruling on a motion under Rule 12 . . . ." Fed. R. Bankr. P. 7052(a)(3).  Accordingly, the Court herein makes no findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

Date:  November 8, 2013

Sontchi, J.  _Clifford S. Sontchi_

## INTRODUCTION

The question before the Court is whether an (alleged) agreement to setoff amounts owed to affiliates of a counterparty (a so called "triangular setoff") is enforceable under the "safe harbor" provisions in sections 559-561 of the Bankruptcy Code.  Prior to their bankruptcy, AHM Investment, one of the Debtors,[2] was a party to a Swap Agreement with Barclays Capital and a Repurchase Agreement with Barclays Bank.  After the filing, Barclays Capital setoff monies owed to the AHM Investment under the Swap Agreement against funds owed to Barclays Bank under the Repurchase Agreement.  Plaintiff herein brought an action for breach of the Swap Agreement, turnover of property of the estate, declaratory judgment regarding the triangular setoff taken by Defendants; as well as, violations of the automatic stay for such setoff.  In addition, Plaintiff also objected to the claims filed by Defendants.  In response, Defendants filed a motion to dismiss the complaint, on which this is the Court's opinion.

As set forth below, the Court finds that a contractual right of setoff that permits netting by multiple affiliates of the contract-counterparty outside of bankruptcy may not be enforced after the commencement of the debtor's bankruptcy cases.  A triangular setoff lacks mutuality and is, therefore, not authorized under the Bankruptcy Code.  As

---

[2] Capitalized terms not defined herein shall have the meaning ascribed to them below.

a result, Plaintiff has made plausible claims against Defendants.  Herein, the Court denies the defendant's motion to dismiss the Amended Complaint.

Furthermore, the Court finds that Plaintiff has made plausible factual allegations that rebut the valid claim presumption established by Defendants.  As a result, the Court denies the motion to dismiss the objections to Defendants' proofs of claim.

## STATEMENT OF FACTS

### I.   The Parties

Plaintiff, Steve D. Sass, as Plan Trustee (the "Plan Trustee" or "Plaintiff") of the American Home Mortgage Plan Trust brought this adversary proceeding asserting both affirmative claims against Barclays Bank PLC ("Barclays Bank") and its affiliate Barclays Capital Inc. ("Barclays Capital" and with Barclays Bank, "Barclays" or the "Defendants") and objections to the claims filed by Defendants.

### II.   The Debtors' Bankruptcy Cases

On August 6, 2007, the Debtors filed for relief under chapter 11 of the Bankruptcy Code.  As of the petition date, the above-captioned debtors (the "Debtors") were authorized to continue to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. On February 23, 2009, the Court entered the Confirmation Order.  The Effective Date of the Plan (as defined therein) occurred on November 30, 2010.  Pursuant to the Confirmation Order and the Plan, certain of the Debtors' assets were transferred to the Plan Trust upon the Effective Date.

Pursuant to the Plan and the Plan Trust Agreement, the Plan Trustee is permitted to, among other things, prosecute Causes of Action and object to Claims (each as defined in the Plan).

## III.    Procedural History

In April 2011, Plaintiff commenced this adversary action against Defendants by filing a complaint.  Subsequently, Plaintiff filed an amended complaint[3] (the "Amended Complaint") asserting both affirmative claims against Defendants and objections to Defendants' Swap Claim and Repurchase Claim (both as defined below).   The Amended Complaint alleges nine (9) causes of action, which include: breach of the Swap Agreement, request for turnover of property of the estate, a request for declaratory judgment regarding triangular set-off and violation of the automatic stay, and objections to the Repurchase Claim and Swap Claim.[4]   In response, Defendants filed a motion to dismiss each of the nine counts based on the argument that (i) the Bankruptcy Code and the terms of the Swap Agreement permit the triangular setoff effectuated by Defendants and as such Counts I-VII and IX fail to state a claim; and (ii) Counts VIII should be dismissed because Plaintiff failed to rebut the *prima facie* validity

---

[3]  Adv. Pro. D.I. 20.

[4]  More specifically, the counts in the Complaint are as follows: (i) Count I against Barclays Bank for breach of contract; (ii) Count II against Barclays Bank for turnover of property of the estate pursuant to 11 U.S.C. § 542; (iii) Count III against Barclays Capital for turnover of property of the estate pursuant to 11 U.S.C. § 542; (iv) Count IV against Barclays Bank for declaratory judgment regarding Barclay Bank's prohibited triangular setoff; (v) Count V against Barclays Bank for declaratory judgment regarding Barclays Bank's violation of the automatic stay; (vi) Count VI against Barclays Capital for declaratory judgment regarding Barclays Capital prohibited triangular setoff; (vii) Count VII against Barclays Capital for declaratory judgment regarding Barclays Capital's violation of the automatic stay; (viii) Count VIII is the objection to Barclay Capital's Repurchase Claim; and (ix) Count IX is the objection to Barclay Bank's Swap Claim.

of the Repurchase Claim (more specifically, the "Deficiency Claim" portion of the claim). Plaintiff refutes Defendants' motion to dismiss. The motion to dismiss has been fully briefed and is ripe for the Court's consideration.

## IV.    Repurchase Agreement and Swap Agreements and Related Claims

### A.  The Repurchase Agreement

American Home Mortgage Investment Corp. ("AHM Investment") and Barclays Capital are parties to a Master Repurchase Agreement dated February 8, 2006 (together with all annexes, confirmations and schedules thereto and as amended, supplemented and/or modified, the "Repurchase Agreement").[5]

The Repurchase Agreement provides that, among other things, AHM Investment, as seller, agrees to transfer to Barclays Capital, as buyer, various securities and other assets (including any Additional Purchased Securities transferred to Barclays Capital during the term of the Repurchase Agreement (the "Purchased Securities")) in exchange for the transfer of funds from Barclays Capital, with a simultaneous agreement by Barclays Capital to transfer to AHM Investment such Purchased Securities as a date certain or on demand in exchange for the transfer of funds from AHM Investment (the "Repurchase Price"). Barclays Capital and Plaintiff (for the most part) agree on the Repurchase Price (but not the value of the Purchased Securities).

---

[5]  Capitalized terms not defined herein shall have the meaning ascribed to them in the Repurchase Agreement.

**B.  Defaults Under and Termination of the Repurchase Agreement**

On August 3, 2007 (the "Repo Termination Date"), Barclays Capital sent AHM Investment a letter captioned as "Declaration of Event of Default/Notice of Repurchase Date/Notice of Termination" (the "Repo Termination Notice").  Therein, Barclays Capital (i) asserted that AHM Investment was in default under the Repurchase Agreement; (ii) accelerated the obligations under the Repurchase Agreement such that AHM Investment was required to immediately repurchase all of the Purchased Securities in Barclays Capital's possession under the Repurchase Agreement as of August 3, 2007; and (iii) terminated the Repurchase Agreement.  Because AHM Investment did not have the cash to buy back the Purchased Securities, Barclays Capital retained possession of the Purchased Securities and subsequently asserted a deficiency claim against AHM Investment for the alleged difference between the Repurchase Price and the value of the Purchased Securities.

**C.  Swap Agreement and the Cap Transactions**

In March of 2006, AHM Investment created the securitization trust AHM Investment Trust 2006-1 (the "Trust") with Deutshe Bank National Trust Company acting as Indenture Trustee.  Barclays Bank was chosen to underwrite the Trust's securitization of various adjustable rate mortgage loans (the "Trust Mortgages") whose rates were tied to the 1-year Treasury Index.  The Trust issued floating rate notes (the "Trust Securities") based on these underlying Trust Mortgages.

The Trust Mortgages have an approximate average interest rate cap of 10%, with an effective interest rate cap of approximately 9% after netting out Trust expenses.  The

floating rate of the Trust Securities, however, is not capped.  The lack of an interest rate cap on the Trust Securities means that an increase in market interest rates over 9% could lead to an inability to service the Trust Securities with payments from the underlying Trust Mortgages.

As part of the underwriting of the Trust Securities, the Trust, Barclays Bank and AHM Investment entered into a series of interest rate cap transactions to hedge against the possibility that prevailing interest rates on the Trust Securities would increase over the effective interest rate cap on the Trust Mortgages.  In order for the Trust Securities to be eligible for a AAA rating, the interest rate cap transactions were set up so that Barclays Bank – which was rated AAA at the relevant time – sold an interest rate cap option (the "Front Cap") to the Trust and AHM Investment simultaneously sold an interest rate cap option to Barclays (the "Back Cap").

The Front Cap would protect the Trust in the event that the interest rate on the Trust Securities increased beyond the interest rate of the underlying Trust Mortgages and the Back Cap would cover Barclays Bank's liability in the event that the Front Cap was exercised by the Trust.  Barclays also entered into two interest rate cap options ("Hedge Cap 1" and "Hedge Cap 2," collectively the "Hedge Caps") with AHM Investment.   These corridor cap transactions were intended to hedge AHM Investment's potential exposure relating to the Back Cap.

The Back Cap and Hedge Caps transactions were governed by the ISDA Master Agreement (Multicurrency-Cross Border), dated as of March 13, 2006 (the "Master

Agreement"), the Schedule to the Master Agreement, dated as of March 13, 2006 (the "Schedule"), the ISDA Credit Support Annex (Bilateral Form) dated as of March 13, 2006 (the "Credit Support Annex"), and certain related Confirmations, and other related transactional documents, as amended, supplemented and modified (collectively, the "Swap Agreement").

The Swap Agreement, among other things, provides that margin protection in the form of cash collateral or securities be delivered to the Swap Agreement counterparty upon demand and under certain circumstances. During the term of the Swap Agreement, AHM Investment provided Barclays Bank with cash and certain securities (collective, the "Swap Collateral") pursuant to the requirements of the Swap Agreement.

On March 29, 2006, AHM Investment transferred various bonds with an aggregate value of $18,994,056 to Barclays Bank as Swap Collateral. The specific bonds held as Swap Collateral changed during the course of the Swap Agreement, as AHM Investment had the right to substitute bonds on an as-needed basis. On April 20, 2007, AHM Investment provided $5,336,536 in cash to Barclays Bank to be held as a portion of the Swap Collateral in exchange for the return of a certain bond (identified as JPMMT 2005-ALT1 2A1 (Cusip 466247XG3)).

The Schedule to the Master Agreement contains a broad setoff provision that purports to authorize Barclays Bank to perform cross-obligation setoffs and cross-

affiliate setoffs.   Part 5(b) of the Schedule to the Master Agreement (the "Setoff

Provision") states, in pertinent part:

> *Right of Set-off.*  In addition to any rights of set-off a party
> may have as a matter of law or otherwise, upon the
> occurrence of an Event of Default with respect to a party . .
> .(in each case, "Party X"), the other party ("Party Y") will
> have the right (but not the obligation) without prior notice to
> Party A or any other person to set-off any obligation of Party
> X owing to Party Y or any of Party Y's Affiliates, branches
> or offices (whether or not arising under this Agreement,
> whether or not matured, whether or not contingent . . . )
> against any obligation of Party Y or any of Party Y's
> Affiliates, branches or offices owning to party X (whether or
> not arising under this Agreement, whether or not matured,
> whether or not contingent . . . ).[6]

This Setoff provision, among other things, purports to permit Barclays Bank to

effectuate a "triangular setoff" of its obligations to AHM Investment under the Swap

Agreement against amounts AHM Investment allegedly owes to Barclays Capital under

the Repurchase Agreement despite the fact that the debts are not mutual under the

circumstances.

### D.  Defaults under and Termination of the Swap Agreement

On August 2, 2007 (the "Swap Termination Date"), Barclays Bank sent AHM

Investment a letter (the "Swap Termination Notice"), pursuant to which Barclays:

(i) asserted that AHM Investment was in default under the Master Agreement;

(ii) designated August 2, 2007, as the Early Termination Date with respect to all

outstanding transactions under the Swap Agreement; and (iii) notified AHM

---

[6]  Adv. D.I. 20 (*First Amended Complaint and Objection to Claims*, Exh. E-2, Part 5(b)).

Investment of Barclays Bank's exercise of its purported right under the Master Agreement to set off any amounts payable to Barclays Bank to AHM Investment against AHM Investment's unsatisfied obligations to Barclays Capital under the Repurchase Agreement.

### E.  Swap Collateral Surplus

In September 2007, Barclays Bank sent AHM Investment a "Statement of Payment on Early Termination of ISDA Master Agreement" asserting that Barclays Bank's was entitled to $3,852,000 in damages under the Swap Agreement.  Plaintiff asserts in the Amended Complaint that Barclays Bank's damages are only $478,352. Plaintiff asserts that on the Swap Termination Date, Barclays Bank held cash collateral plus unpaid accrued interest totaling $5,250,979 and three notes valued at $7,765,397 – making the total value of collateral held by Barclays Bank on the Swap Termination Date $13,016,376.  After using the Swap Collateral to setoff against the swap damages (whether using Barclays Bank's or Plaintiff's assertions regarding the value of the swap damages),[7] there was excess Swap Collateral (the "Swap Collateral Surplus").

### F.  "Triangular Setoff" Effectuated by Barclays

Barclays Bank notified AHM Investment of its intent to set off any amounts payable by Barclays Bank to AHM Investment under the Swap Agreement against AHM Investment's unsatisfied obligations to Barclays Capital under the Repurchase Agreement.  Thereafter, Barclays Bank and/or Barclays Capital applied the Swap

---

[7]  The Damages as of the Swap Termination Date will need to be decided by the Court (or agreed to by the parties); however, for the purposes of this Opinion, the only concern is that there *is* a Swap Collateral Surplus (whether $1 or $1 million).

Collateral Surplus to amounts owed by AHM Investment to Barclays Capital under the Repurchase Agreement.

### G.  Barclay Capital's Repurchase Claim (Claim No. 8980)

Barclays Capital filed proof of claim (the "Repurchase Claim") against AHM Investment regarding their (alleged) claims under the Repurchase Agreement, as identified by the Debtors as claim no. 8980, asserting a general unsecured claim in the total amount of not less than $45,064,682.  The Repurchase Claim includes, without limitation: (i) an alleged $45,043,020 unsecured deficiency claim (the "Deficiency Claim"), (ii) an asserted $21,662 claim on account of legal expenses incurred by Barclays Capital in connection with or as a result of AHM Investment's default under the Repurchase Agreement; and (iii) contingent claims for all indemnities of Barclays Capital set forth in the Repurchase Agreement.

Pursuant to the Repurchase Claim, Barclays Capital calculated the Deficiency Claim portion of the Repurchase Claim as follows:

(i)   calculating the difference between (a) the alleged market values of the Purchased Securities (minus Additional Purchased Securities) and one of the Swap Collateral Surplus positions (a portion of AHM 2006-1 1M6 Note)[8] as determined by Barclays Capital; and (b) the Repurchase Price of $148,541,730 (as asserted by Barclays

---

[8]  Plaintiff alleges that a portion of AHM 2006-1 1M6 was a Purchased Security under the Repurchase Agreement, while the remainder of this note was pledges as part of the Swap Collateral.  *See* Complaint at ¶ 20.

Capital) of these securities as of August 3, 2007.  The net result of this calculation was a purported deficiency in favor of Barclays Capital in the amount of $58,062,662.

(ii) Barclays Capital "credited" AHM Investment for the value of the Additional Purchased Securities that AHM Investment had provided to Barclays Capital as margin payments under the Repurchase Agreement.

(iii) Barclays Capital "credited" AHM Investment for the value of remaining Swap Collateral Surplus which included notes (AHM 2005-SD1 2M2, AHM 2005-SD1 and part of AHM 2006-1 1M6) and remaining cash.

(iv) Barclays Capital made other adjustments, such as a "credit" for principal and interest.

### H.  Value of the Purchased Securities Versus the AHM Repo Obligations

Plaintiff alleges that the value of the Purchased Securities (as discussed in more detail below) exceeds the AHM Repo Obligations on the Repo Termination Date and, thus, Plaintiff alleges that Barclays Capital does not have a Deficiency Claim (i.e. there are no damages under the Repurchase Agreement or other amounts owed to Barclays Capital).  As a result, Plaintiff seeks to disallow the Repurchase Claim.

Plaintiff's alleged value of the Purchased Securities is comprised of the following: (i) Barclays Capital's own value of certain AAA-rated securities (not less than $100,736,438);[9] (ii) an independent discounted cash flow analysis (the "DCF Analysis")

---

[9]  The AAA-rated securities are the following: RALI 2005-QA9 NB42, AHM 2005-4 3A3, AHM 2005-1 4A2. DBALT 2005-AR2 4R2, INDX 2005-AR31 2A2, AHM 2004-1 3A, AHM 2007-A 2A, SASC 2003-40A 3A2, SASDC 2003-37A 1A, INDX 2005-AR31 2A2, MARM 2003-6 7A1 and AHM 2007-2 13A2 (collectively, the "AAA Notes").

of the remaining notes comprising the Purchased Securities;[10]  (iii) July 2007 principal and interest payments received by Barclays Capital in the total amount of $1,164,789 (the "P&I Payments); and (iv) cash collateral totaling $1,365,881 (the "Repo Cash Collateral").  Plaintiff did not allege the results of the DCF Analysis (which Defendants claim is a fatal flaw in the Amended Complaint).  However, it can be extrapolated that Plaintiff asserts the Purchased Securities are worth, in aggregate, in excess of $148,562,568.

Plaintiff asserts that value of the sum of the Repurchase Price and all other allowed damages under the Repurchase Agreement (collectively, the "AHM Repo Obligations") is $148,562,568 on the Repo Termination Date.  Plaintiff concludes that Barclays Capital has no deficiency under the Repurchase Agreement as the aggregate value of the Purchased Securities as of the Repo Termination Date exceeds the AHM Repo Obligation.  Plaintiff continues that *even if* Barclays Capital had a deficiency claim – such deficiency claims cannot be reduced by the Swap Collateral Surplus.

## I.   Barclays Bank's Swap Claim (Claim No. 8979)

Barclays Bank filed a proof of claim (the "Swap Claim") against AHM Investment regarding their (alleged) claims under the Swap Agreement, as identified by the Debtors as claim no. 8979, asserting a general unsecured claim in an amount not less than $10,830.  The Swap Claim consists of the following: (i) $10,830 on account of legal

---

[10]  The remaining notes are the following: AHM 2006-1 1M4, AHM 2006-1 1M5, AHM 2006-1 1M6, AHM 2007-A 1M1, AHM 2007-A 2M1, AHM 2007-1 2M2, AHM 2007-A4M2, AHM 2007-a 2M3, AHM 2007-A 2M4 and AHM 2007-A 4M3 (collectively, the "Remaining Notes").

expenses purportedly incurred by Barclays Bank in connection with the enforcement and protection of its rights under the Swap Agreement or by reasons of the early termination of the transactions contemplated by the Swap Agreement; and (ii) contingent claims for all indemnities of Barclays set forth in the Swap Agreement.

### J.  Overview of the Parties' Positions

In its Amended Complaint, Plaintiff argues that (i) triangular setoff is not allowable under the Bankruptcy Code and (ii) if it were allowed, triangular setoff is improper in this case as it violates the terms of the Swap Agreement.  Plaintiff further asserts that Barclays Bank and/or Barclays Capital violated the automatic stay by performing a triangular setoff not permitted by either applicable law or the terms of the Swap Agreement.  Barclays has moved to dismiss the Amended Complaint on the basis that (i) the terms of the Swap Agreement allow triangular setoff; (ii) the safe harbor provisions for swap and repurchase agreement, 11 U.S.C. §§ 559-561, do not require mutuality, thus, allowing for triangular setoff;  and (iii) as a result, it did not violate the automatic stay.

As the Court finds (as set forth in detail below) that triangular setoff is not allowable under the Bankruptcy Code, the Court does not need to discuss whether triangular setoff is allowed pursuant to the terms of the Swap Agreement.  In other words, *even if* triangular setoff was allowed pursuant to the terms of the Swap Agreement, the Bankruptcy Code does not allow parties to set-off non-mutual obligations, regardless of whether the agreements are incorporated in the safe harbor

provisions of 11 U.S.C. §§ 559-661.  As such, the Court will focus its opinion, almost entirely, on the issue of triangular set-off.

## JURISDICTION

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).  This Court has the judicial power to enter a final order.

## STANDARD OF REVIEW

A motion under Rule 7012(b)(6)[11] serves to test the sufficiency of the factual allegations in the plaintiff's complaint.[12]  With the Supreme Court's decisions in *Bell Atlantic Corp. v. Twombly*[13] and *Ashcroft v. Iqbal*,[14] "pleading standards have seemingly shifted from simple notice pleading to a more heightened form of pleading, requiring a plaintiff to plead more than the possibility of relief to survive a motion to dismiss."[15]

In *Iqbal*, the Supreme Court makes clear that the *Twombly* "facial plausibility" pleading requirement applies to all civil suits in the federal courts.[16]  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements"

---

[11]  Federal Rules of Civil Procedure 8(a) and 12(b)(6) are made applicable to this adversary proceeding pursuant to Federal Rules of Bankruptcy Procedure 7008 and 7012(b), respectively.

[12]  *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993) ("The pleader is required to set forth sufficient information to outline the elements of his claim or to permit inferences to be drawn that these elements exist." (citations omitted)).

[13]  550 U.S. 544 (2007).

[14]  129 S. Ct. 1937 (2009).

[15]  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

[16]  *Id.*

are insufficient to survive a motion to dismiss.[17]  Rather, "all civil complaints must now

set out sufficient factual matter to show that the claim is facially plausible."[18]  A claim is

facially plausible "when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged."[19]

Determining whether a complaint is "facially plausible" is "a context-specific task that

requires the reviewing court to draw on its judicial experience and common sense."[20]

But where the well-pleaded facts do not permit the court to infer more than the mere

possibility of misconduct, the complaint has alleged - but not shown - that the pleader is

entitled to relief."[21]

    After *Iqbal*, the Third Circuit has instructed this Court to "conduct a two-part

analysis.  First the factual and legal elements of a claim should be separated.  The

[court] must accept all of the complaint's well-pleaded facts as true, but may disregard

---

[17]  *Iqbal*, 129  S. Ct. at 1949.  *See also Sands v. McCormick*, 502 F.3d 263, 268 (3d Cir. 2007) (citations omitted); *Bartow v. Cambridge Springs SCI*, 285 Fed. Appx. 862, 863 (3d Cir. 2008) ("While facts must be accepted as alleged, this does not automatically extend to bald assertions, subjective characterizations, or legal conclusions.); *General Motors Corp. v. New A.C. Chevrolet, Inc.*, 263 F.3d 296, 333 (3d Cir. 2001) ("Liberal construction has its limits, for the pleading must at least set forth sufficient information for the court to determine whether some recognized legal theory exists on which relief could be accorded the pleader. Conclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss.  While facts must be accepted as alleged, this does not automatically extend to bald assertions, subjective characterizations, or legal conclusions." (citations omitted)).

[18]  *Fowler*, 578 F.3d at 210 (internal quotations omitted).  *See also Iqbal*, 129 S. Ct. 1950 ("While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."); *Buckley v. Merrill Lynch & Co. (In re DVI, Inc.)*, 2008 Bankr. LEXIS 2338 (Bankr. D. Del. Sept. 16, 2008) ("Rule 8(a) requires a showing rather than a blanket assertion of an entitlement to relief.  We caution that without some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only fair notice, but also the grounds on which the claim rests."(citations omitted)).

[19]  *Iqbal*, 129 S. Ct. at 1949.

[20]  *Iqbal*, 129 S. Ct. at 1950.  "It is the conclusory nature of [plaintiff's] allegations, rather than their extravagantly fanciful nature, that disentitles them to the presumption of truth." *Id.* at 1951.

[21]  *Id.* at 1950 (citations and internal quotations omitted).

16

any legal conclusions."[22]   The court "must then determine whether the facts alleged in

the complaint are sufficient to show that the plaintiff has a plausible claim for relief."[23]

The Third Circuit has further instructed that "[s]ome claims will demand relatively

more factual detail to satisfy this standard, while others require less."[24]

## DISCUSSION

The crux of the Amended Complaint (Counts I, II, III, IV, and VI) and the

briefing on the motion to dismiss briefing is whether the Bankruptcy Code allows for

triangular setoff in swap and repurchase agreements.

---

[22]  *Fowler*, 578 F.3d at 210-11.   *See also Twombly*, 550 U.S. at 555 (holding that a court *must* take the complaint's allegations as true, no matter how incredulous the court may be); *Iqbal*, 129 S. Ct. at 1949-50 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. . . . When there are well-plead factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."); *Winer Family Trust v. Queen*, 503 F.3d 319, 327 (3d Cir. 2007); *Carino v. Stefan*, 376 F.3d 156, 159 (3d Cir. 2004).   The Court may also consider documents attached as exhibits to the Complaint and any documents incorporated into the Complaint by reference.   *In re Fruehauf Trail Corp.*, 250 B.R. 168, 183 (Bankr. D. Del. 2000) (*citing PBGC v. White*, 998 F.2d 1192, 1196 (3d Cir. 1993)).   "[I]f the allegations of [the] complaint are contradicted by documents made a part thereof, the document controls and the Court need not accept as true the allegations of the complaint."   *Sierra Invs., LLC v. SHC, Inc. (In re SHC, Inc.)*, 329 B.R. 438, 442 (Bankr. D. Del. 2005).   *See also Sunquest Info. Sys., Inc. v. Dean Whitter Reynolds, Inc.*, 40 F. Supp. 2d 644, 649 (W.D.Pa. 1999) ("In the event of a factual discrepancy between the pleadings and the attached exhibit, the exhibit controls." (citations omitted)).

[23]  *Fowler*, 578 F.3d at 211 (internal quotations omitted) ("[A] complaint must do more than allege the plaintiff's entitlement to relief.  A complaint has to 'show' such an entitlement with its facts." (citations omitted)).  "The plaintiff must put some 'meat on the bones' by presenting sufficient factual allegations to explain the basis for its claim."   *Buckley v. Merrill Lynch & Co., Inc. (In re DVI, Inc.)*, 2008 Bankr. LEXIS 2338, at *13 (Bankr. D. Del. Sept. 16, 2008).

[24]  *In re Ins. Brokerage Antitrust Litig.*, 2010 U.S. App. LEXIS 17107, *46-47 n. 18 (3d Cir. Aug. 16, 2010).  *See also Arista Records LLC v. Doe*, 604 F.3d 110, 120-21 (2d Cir. 2010) (stating that *Twombly* and *Iqbal* require factual amplification where needed to render a claim plausible, not pleadings of specific evidence or extra facts beyond what is needed to make a claims plausible).

## I.    There is a Mutuality Requirement for Setoffs in Swap Agreements.

### A.  Section 553's Mutuality Requirement For Setoff

The "Bankruptcy Code does not establish an independent right to setoff, but section 553 does preserve any right of setoff that may exist under applicable non-bankruptcy law."[25]  Section 553[26] applies "whenever a creditor seeks to exercise *any* purported setoff right – including one created by contract - in a case under the Bankruptcy Code."[27]  Section 553 imposes "additional restrictions on a creditor seeking setoff that must be met to impose a setoff against a debtor in bankruptcy."[28]  To be eligible for setoff under section 553, "(1) the amount owed by the debtor must be a prepetition debt; (2) the debtor's claim against the creditor must also be prepetition; and (3) the debtor's claim against the creditor and the debt owed the creditor must be mutual."[29]  As Judge Shannon held in *SemCrude*:

---

[25]  *In re Lehman Brothers Holdings Inc.*, 433 B.R. 101, 107 (Bankr. S.D.N.Y. 2010) (citations omitted) (hereinafter referred to as "*Lehman/Swedbank*").

[26]  Section 553 states in part:

> Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case . . .

11 U.S.C. § 553(a).

[27]  *In re Lehman Brothers Inc.*, 458 B.R. 134, 139 (2011) (emphasis supplied) (hereinafter referred to as "*Lehman/UBS*").

[28]  *In re SemCrude, L.P.*, 399 B.R. 388, 393 (Del. Bankr. 2009) *aff'd*, 428 B.R. 590 (D. Del. 2010) (citations and internal quotations omitted) (hereinafter referred to as "*SemCrude*").

[29]  *Lehman/Swedbank*, 443 B.R. at 107 (citations omitted); *Lehman/UBS*, 458 B.R. 139 (citations omitted).  *See* 11 U.S.C. § 553(a) (mutuality is in the express language of §553).  *See also Semcrude*, 399 B.R. at 396; *Westinghouse Credit Corp. v. D'Urso*, 278 F.3d 138, 149 (2d Cir. 2002); and *In re Westchester Structures, Inc.*, 181 B.R. 730, 740 (Bankr. S.D.N.Y. 1995).

> The authorities are also clear that debts are considered "mutual" only when they are due to and from the same persons in the same capacity. Put another way, mutuality requires that each party must own his claim in his own right severally, with the right to collect in his own name against the debtor in his own right and severally. Because of the mutuality requirement in section 553(a), courts have routinely held that triangular setoffs are impermissible in bankruptcy. Moreover, because each corporation is a separate entity from its sister corporations absent a piercing of the corporate veil, a subsidiary's debt may not be set off against the credit of a parent or other subsidiary, or vice versa, because no mutuality exists under the circumstances. Allowing a creditor to offset a debt it owes to one corporation against funds owed to it by another corporation—even a wholly-owned subsidiary—would thus constitute an improper triangular setoff under the Code.[30]

Although the Bankruptcy Code does not defined "mutuality," a majority of courts to consider the issue have held:

> debts are mutual only if "they are due to and from the same persons in the same capacity." It is also widely accepted that "mutuality is strictly construed against the party seeking setoff." The effect of this narrow construction is that "each party must own his claim in his own right severally, with the right to collect in his own name against the debtor in his own right and severally."[31]

In *SemCrude*, Judge Shannon analyzed triangular set-off between three debtors and a supplier. The supplier was seeking to setoff a debt owed to one of the debtors versus a balance due to the supplier from another debtor. Judge Shannon held that "mutuality

---

[30] *SemCrude*, 399 B.R. at 393-94.

[31] *Id*. at 396 (citations omitted).

cannot be supplied by a multi-party agreement contemplating a triangular setoff."[32]

Judge Shannon reasoned:

> Section 553, like section 68 of the Bankruptcy Act before it, speaks not only of a "mutual debt," but of a mutual debt owing between a particular creditor and a particular debtor. Or, to be more precise, section 553 preserves only the "right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement [of the bankruptcy case] against a claim of *such* creditor against the debtor that arose before the commencement of the case." In articulating exactly who must owe whom a debt to effect a setoff under section 553(a), Congress used a greater detail of precision than is seen in many other parts of the Code.[33]

In so holding, the *SemCrude* court held that there was no contractual exception to the mutual debt requirement.[34] This Court concurs entirely with Judge Shannon's decision.

As it is established that debts must be mutual to be setoff and parties cannot contract around this requirement, the Court must determine whether the safe harbor provisions of sections 559-561 alter that requirement.

### B. Interplay between section 553 and section 561.

Barclays argues that sections 559-561 create a safe-harbor for swap and repurchase agreements and that this safe harbor exempts these types of agreements from the mutuality requirements discussed *supra*.

Section 561 of the Bankruptcy Code provides, in relevant part, that:

---

[32] *Id.* at 397.

[33] *Id.* (*quoting* 11 U.S.C. § 553(a); emphasis supplied).

[34] *Id.* at 399. *See also Lehman/UBS*, 458 B.R. at 141 ("*SemCrude* held that a right to triangular setoff set forth in a contract does not create mutuality for purposes of section 553, and that there is no contract exception to section 553. . . . The Court agrees with the *SemCrude* court – triangular setoff is not (and never was) permitted under the Bankruptcy Code.").

> [t]he exercise of any contractual right . . . to offset or net termination values, payment amounts, or other transfer obligations arising under or in connection with one or more . . . (5) swap agreements . . . shall not be stayed, avoided, or otherwise limited by operation of any provision of this title or by any order of a court or administrative agency in any proceeding under this title.[35]

Courts have faced the issue of the interplay between section 553 and these "safe harbor" provisions.  The progression of the courts' rulings has assisted this Court's analysis and as such will be discussed below.

In *Lehman/Swedbank*, the bankruptcy court examined whether Swedbank could setoff a prepetition fund being held by the bank against postpetition deposits made by the debtors.  Although clearly distinguishable from the case *sub judice* as the *Lehman/Swedbank* court was examining a setoff between pre and post-petition funds and this Court is examining setoff of prepetition amounts among affiliates, the *Lehman/Swedbank* court's analysis is persuasive in its analysis of section 553 and the safe harbor provisions in sections 559-61.

The *Lehman/Swedbank* court noted that "[p]lainly, the mututality requirement of section 553 precludes a creditor-bank from offsetting a debtor's prepetition obligations against funds deposited with the creditor-bank post-petition."[36]  The bankruptcy court continued to rule that sections 560 and 561 do not nullify the mutuality requirement of section 553(a).  The *Lehman/Swedbank* Court held:

> By their plain terms, these safe harbor provisions do not alter the axiomatic principle of bankruptcy law, codified in

---

[35] 11 U.S.C. § 561(a).

[36] *Lehman/Swedbank*, 433 B.R. at 108.

section 553, requiring mutuality in order to exercise a right of setoff. These safe harbor provisions simply do not directly address the requirement of mutuality under section 553(a). Instead, these exceptions permit the exercise of a contractual right of offset in connection with swap agreements, notwithstanding the operation of any provision of the Bankruptcy Code that could operate to, avoid or otherwise limit that right, but that right must exist in the first place. Given the silence of the safe harbor provisions with respect to the mutuality requirement of section 553(a), the Court declines to read an exception into the statute.[37]

In so ruling, the *Lehman/Swedbank* court examined the language of the statue and relevant legislative history and found that the legislature intended to leave intact the mutuality requirements set forth in section 553.[38]

On appeal, the district court affirmed the *Lehamn/Swedbank* holdings and further expanded on the legislative history supporting sections 559-561.[39] The district court held that the legislative history of these safe harbor provisions explained the provisions' threefold goals: (i) to allow a non-debtor swap participant or the trustee to terminate a swap agreement so that a swap agreement could only continue after the bankruptcy is filed only by mutual consent of the non-debtor swap participant and the trustee; (ii) to permit immediate termination in order to minimize exposure to market volatility; and (iii) to address the need for swap participants to be able to close out existing transactions without fear that (a) closing out swaps would violate the stay, (b) a debtor

---

[37] *Id.* at 109.

[38] *Id. at* 433 B.R.109-113 ("Plainly, then, the 2005 amendments to section 553 with respect to sections 560 and 561 are narrow and leave intact the mutuality requirement of section 553(a). Such an interpretation dovetails with common sense. If Congress had intended to eliminate the mutuality requirement of section 553(a), it would have done so directly and with clarity.").

[39] *Swedbank AB (PUBL) v. Lehman Brothers Holdings Inc. (In re Lehman Bros. Holdings Inc.),* 445 B.R. 130 (S.D.N.Y. 2011) (hereinafter "*Swedbank/Lehman District Court Opinion*").

would opportunistically reject unfavorable swaps and assume favorable ones; or (c) the transactions would be challenged as voidable preferences.[40]   This Court can find nothing contrary in the legislative history and agrees with the district court's opinion.

Thereafter, the court in *Lehman/UBS* faced the identical issue now raised by Barclays – whether setoff of prepetition accounts among affiliates that is (or in this case *may be*) provided for in the Swap and Repurchase Agreements is allowable.   In *Lehman/UBS*, the trustee for the debtors sought to enforce the automatic stay (among other stays issued by court order) against UBS AG ("UBS") and recover excess collateral that had been held by UBS since the date of the termination of a swap agreement between the parties.[41]   UBS setoff the excess collateral against amounts owing from the debtor to an UBS affiliate.[42]   The trustee disputed the validity of any alleged setoff right under the swap agreement.[43]

The *Lehman/UBS* court made the following findings: (1) the provision in the prepetition swap agreement authorizing setoff of amounts owed to affiliates of a counterparty (i.e. triangular setoff) was unenforceable in bankruptcy;[44] (2) there was no "contract" exception to the mutuality requirement for exercise of setoff rights in bankruptcy;[45] (3) "safe harbor" exceptions to the automatic stay, that provide for

---

[40] *Swedbank/Lehman District Court Opinion* at 135-36 (*citing* and *quoting* H.R. Rep. No. 484, H.R. REP. 101-484 (1990), *reprinted in* 1990 U.S.C.C.A.N. 223; *available at* 1990 WL 92539).

[41] *Lehman/UBS*, 458 B.R. at 137-38.

[42] *Id.*

[43] *Id.*

[44] *Id.* at 140-41.

[45] *Id.*

exercise of contractual right of setoff in connection with swap agreements notwithstanding the operation of any provision of the Bankruptcy Code which could operate to "stay, avoid or otherwise limit" that right, could not be interpreted as implicitly doing away with the mutuality requirement for setoff;[46] and (4) creditor's good faith belief that triangular right of setoff was authorized did not excuse the stay violation that occurred when the creditor, without moving for relief from stay exercised control over property of the debtor's estate by retaining funds in exercise of its alleged triangular setoff rights.[47]  The court further stated:

> As this Court noted in [*Lehman/Swedbank*], the safe harbors permit the exercise of a contractual right of offset in connection with swap agreements, notwithstanding the operation of any provision of the Bankruptcy Code that could operate to stay, avoid or otherwise limit that right, but that right must exist in the first place.  In addition, in its Memorandum and Order affirming [*Lehman/Swedbank*], the District Court found it "significant" that "there is no mention in the legislative history that the Safe Harbor Provisions were intended to eliminate the mutuality requirement."  **Because there is no mutuality, UBS has no right of offset, and nothing in section 561 of the Bankruptcy Code can be read to preserve or protect a right that does not otherwise exist.**[48]

Barclays' position urges the Court to disagree with the *Lehman/UBS* court – however, the Court is not inclined to do so.  This Court agrees with Judge Peck's analysis –

---

[46] *Id.* at 143.

[47] *Id.* at 143-44.

[48] *Id.* at 143 (emphasis added) (*citing Lehman/Swedbank*, 433 B.R. at 109 and *Swedbank/Lehman* District Court Opinion, 445 B.R. at 137).

nothing in section 561 of the Bankruptcy Code can preserve or protect a right that that does not exist, inclusive of the mutuality requirement demanded in section 553.

### C. Policy

Furthermore, the Court finds that the policies set forth in the Bankruptcy Code supports the mutuality requirement for setoff.  The policy argument advanced by Judge Shannon in *SemCrude* (and as agreed with by Judge Peck in *Lehman/UBS*) is equally as pervasive in the facts *sub judice:*

> One of the primary goals—if not the primary goal—of the Code is to ensure that similarly-situated creditors are treated fairly and enjoy an equality of distribution from a debtor absent a compelling reason to depart from this principle. By allowing parties to contract around the mutuality requirement of section 553, one creditor or a handful of creditors could unfairly obtain payment from a debtor at the expense of the debtor's other creditors, thereby upsetting the priority scheme of the Code and reducing the amount available for distribution to all creditors. . . . Such a result is clearly contrary both to the text of the Code and to the principle of equitable distribution that lies at the heart of the Code.[49]

The identical policy issue holds true here – when a debtor is owed money and collects less due to offsets claimed by affiliates of its named contract-counterparty, the debtor's creditors are impacted by the reduction in amounts to be realized by the debtor's estate.[50]  The Court finds that the equitable distribution policies and principals of the Bankruptcy Code are consistent with this Court's rulings set forth above.

---

[49] *SemCrude*, 399 B.R. at 399 (citations omitted); *Lehman/UBS*, 458 B.R. at 144.

[50] *See also Lehman/UBS*, 458 B.R. at 144 ("The identity of the named counterparty to a contract is an essential aspect of settling mutual accounts, and to disregard this most basic of corporate formalities and treat subsidiaries as if they have the same standing as their parent for purposes of setoff rights is to ignore

### D.  Automatic Stay

Defendant asserts that the automatic stay does not apply to interfere with the (alleged) set-off rights in the respective contracts.  As this Court holds that a triangular set-off is not permissible, Plan Trustee has asserted plausible claims that Defendants have violated the automatic stay.  As such, the motion to dismiss Counts V and VII will be denied.

### E.  Conclusion

As set forth above, this Court holds, in keeping with its sister courts, that (i) parties cannot contract around the mutuality requirements for the exercise of the right to setoff in bankruptcy as required by section 553, (ii) the safe harbor provisions exceptions to the automatic stay embodied in sections 559-561 cannot be interpreted as implicitly removing the mutuality requirement for setoff; and (iii) without moving for relief from stay, the non-debtor counterparty to swap and repurchase agreements cannot exercise control over property of the estate by retaining funds in exercise of its alleged triangular setoff rights.  As a result, Plaintiff asserted plausible claims against Defendants.  Therefore, Defendants' motion to dismiss will be denied as to Counts I-VII of the Amended Complaint.

## II.   Objections to the Swap Claim and the Repurchase Claim

Barclays has also moved to dismiss Plan Trustee's objections to Defendants' Repurchase Claim and Swap Claim.  Each claim is discussed below:

---

the separate nature of these entities to the obvious detriment of other creditors. For that reason, mutuality is an essential, definitional element of the right to setoff that must be strictly observed.").

**A.  Objection to the Swap Claim**

In the Amended Complaint, Plan Trustee objects to the Swap Claim on the grounds that the Swap Claim should be disallowed in its entirety because Barclays Bank has offset the Swap Damages against the Swap Collateral in full satisfaction of any amounts owed to Barclays under the Swap Agreement.  Plan Trustee asserts that Barclays Bank has no amounts owed to it under the Swap Agreement.

Barclays asserts, in its motion to dismiss, that Plaintiff's objection to the Swap Claim only has merit if the use of the entirety of the Swap Collateral Surplus to set-off against deficiencies in the Repurchase Agreement was improper.[51]

The Court has held that the setoff was, in fact, improper.  As such, Plan Trustee's objection to the Swap Claim is plausible and the Court will deny the motion to dismiss Count IX of the Amended Complaint.

**B.  Objection to the Repurchase Claim**

In the Amended Complaint, Plan Trustee objects to the Repurchase Claim on the grounds that the Repurchase Claim should be disallowed in its entirety because the total value of the Purchased Securities as of the Repo Termination Date exceeds the AHM Repo Obligation.  Plan Trustee asserts that Barclays Capital has no deficiency claim or other amounts owed to it under the Repurchase Agreement.

In its motion to dismiss, Barclays asserts that Plaintiff fails to provide results from the DCF Analysis of the Purchased Securities, which is approximately one-third of Plaintiff's value of the Remaining Notes.  Barclays claims that the *mere* reference of a

---

[51] Adv. D.I. 27 (Motion to Dismiss at p. 22).

DCF Analysis to dispute the Repurchase Claim is not enough to rebut the valid claim presumption.

Plaintiff responds that the Repurchase Claim is not entitled to *prima facie* validity because Barclays failed to include any documents that actually support its determination of the alleged Deficiency Claim.  In the alternative, Plaintiff argues that *if* the Court finds that the Repurchase Claim is *prima facie* valid, *then* the factual allegations in the Amended Complaint overcome the *prima facie* validity of the claim. Plaintiff asserts that the inquiry is whether the value that Plaintiff attributed to the Remaining Notes is appropriate under the circumstances and required a factual determination of, among other things, whether a commercially reasonable market existed for the Remaining Notes as of the Repo Termination Date and, if not, whether the DCF Analysis is a commercially reasonable determination of value.

Barclays replies that Plaintiff has not offered the facts necessary to conclude that the Purchased Securities exceeds the AHM Repo Obligation.  Moreover, Barclays claims that the Amended Complaint fails to address the Repurchase Agreement's contractual requirements for valuing the Purchased Securities.  Barclays alleges that the Repurchase Claim specifies that Barclays gave "the defaulting party credit for such Purchased Securities in an amount equal to the price therefore on such date, obtained from a generally recognized source or the most recent closing bid quotation from such a source."[52]  Furthermore, Barclays argues that the Repurchase Claim and Repurchase

---

[52] Repurchase Claim ¶ 5 (*quoting* Repurchase Agreement § 11(d)(i)(B)).

Agreement also state that "in the absence of a generally recognized source for prices or bid or offer quotations for any Security, the nondefaulting party may establish the course therefore in its sole discretion."[53]  Barclays claims that Plaintiff cannot substitute its DCF Analysis for the contractually-specified methods of valuation.  Barclays further asserts that Plaintiff cannot properly reach discovery unless it has sufficiently countered the Repurchase Claim with alleged facts of equal force.

The burden of proof regarding the allegations set forth in a proof of claim shifts:

> Initially, the claimant must allege facts sufficient to support the claim.  If the averments in his filed claim meet this standard of sufficiency, it is *prima facie* valid.  In other words, a claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward.  The burden of going forward then shifts to the objector to produce evidence sufficient to negate the prima facie validity of the filed claim.  It is often said that the objector must produce evidence equal in force to the *prima facie* case.  In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's legal sufficiency.  If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence.  The burden of persuasion is always on the claimant.[54]

Pursuant to Federal Rule of Bankruptcy 3001, where a proof of claim does not provide the facts and documents necessary to support the claim, it is not entitled to the

---

[53]  Repurchase Agreement § 11(d)(2).

[54]  *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 173-74 (3d Cir. 1992) (citations and internal quotations omitted). *See also VFB LLC v. Campbell Soup Co.*, 482 F.3d 624, 636 (3d Cir. 2007); *In re Smurfit-Stone Container Corp.*, 444 B.R. 111, 117 (Bankr. D. Del. 2011) ("The burden of proof related to claims and claims' objections shifts between the proponent of, and objector to, a claim." (citations omitted)); *In re LandSource Communities Dev. LLC*, 08-11111 KJC, 2013 WL 149464, *5 (Bankr. D. Del. Jan. 11, 2013) (citations omitted).

presumption of *prima facie* validity.[55]   The Court has a twofold task: (i) determining if

the Repurchase Claim is *prima facie* valid; and (ii) if it is, determining whether Plaintiff,

taking all facts asserted in the Amended Complaint as true,[56] plausibly rebutted the

*prima facie* validity in order to survive the motion to dismiss.

### i.    *Prima Facie* Validity of the Repurchase Claim

The first inquiry the Court is in determining whether the Repurchase Claim

establishes *prima facie* validity.   The Repurchase Claim attaches a summary of the

contracts between the parties and an explanation of the calculations comprising the

claim, which includes citations to the Repurchase Agreement.   The Repurchase Claim

also attaches the "Master Repurchase Agreement between Barclays Capital Inc. and

American Home Mortgage Investment Corp., dated February 8, 2006; the termination

letter dated August 3, 2007; a calculation of Barclays (alleged) Deficiency Claim, and a

copy of the Margin Call.

Plaintiff urges that the Repurchase Claim has not established *prima facie* validity.

In comparison, Plaintiff cites *In re All-American Auxilliary Ass'n*, wherein the court found

that the insider-claimant did not establish *prima facie* validity of his claim because he did

not provide written documentation of his employment or any corporate action

authorizing the payment of salary or reimbursement of expenses, nor was there any

evidence as to the amount of time the claimant spent on the debtor's affairs or the

---

[55]  *In re Kincaid*, 388 B.R. 610, 614 (Bankr. E.D. Pa. 2008) (citations omitted).

[56]  *Fowler*, 578 F.3d at 211 (internal quotations omitted).

reasonable value of his services to the debtor.[57]   In its holding, the court distinguished claims of insiders who need to show the inherent fairness and good faith of the challenged transaction and the reasonable value of the claim, and stated that there was a heightened scrutiny when the creditor exercised domination and control over the debtor.[58]   The court found that the insider-creditor was not entitled to *prima facie* validity as the claim was, in part, supported by self-serving documentation of no evidentiary benefit because it consisted of the insider-creditor's "unsubstantiated and self-serving recapitulations of his claim."[59]   The court made this determination after an evidentiary hearing on the objection to the claim.[60]

The case *sub judice* is distinguishable as the Repurchase Claim attaches the Repurchase Agreement, a summary of the claim (including citations to the relevant sections of the Repurchase Agreement), the termination letter, a calculation of the amount of the claim and a copy of the Margin Call.[61]   Plaintiff argues that merely

---

[57]  *In re All-Am. Auxiliary Ass'n*, 95 B.R. 540, 544 (Bankr. S.D. Ohio 1989)

[58]  *Id.*

[59]  *Id.* at 545.

[60]  *Id.* at 541.

[61]  Plaintiff also cites to *In re Marino* in support of its position that the claim is not entitled to *prima facie* validity.  *Matter of Marino*, 90 B.R. 25 (Bankr. D. Conn. 1988).  This case is also distinguishable on many facts, including, most importantly, the two day evidentiary hearing held by the court.  In *Marino*, the lease which was the basis of the claim did not include the schedule of damages, as a result, the court could not calculate the damages under the lease.  *Id.*  The *Marino* court concluded that a valid basis for the amount claimed had not been shown.  *Id.* at 28-29.  *See also In re Lehman Bros. Holdings Inc.*, 08-13555 JMP, 2010 WL 4818173 (Bankr. S.D.N.Y. Nov. 10, 2010) ("A claimant's belief as to a possible theory of liability does not make that theory plausible and is not enough to overcome an objection to a claim. . . . [The claimant] has no documents to support his claim and he has not made a sufficient showing that the testimony to be elicited is likely to support his beliefs regarding [the debtor] or that any grounds exist to authorize what would amount to an open-ended fishing expedition.").

attaching documents is not enough to establish a claim and that the attached documents do not support Barclays determination of its Deficiency Claim.  However, whether a proof of claim sets forth all the "facts necessary to support its claim is a **substantive** question to be determined by reference to applicable state law."[62]  The Court has not had the opportunity to review or hear evidence in support of the Repurchase Claim. However, the Repurchase Claim establishes a contractual relationship between AHM Investment and Barclays Capital, it alleges and identifies the notes that were repurchased and those held as collateral and provided the calculation forming the basis of the amount of the claim.  The Court is satisfied, at this stage of the proceedings, that Barclays established the *prima facie* validity of its Repurchase Claim.

### ii.    Plausibility of Plaintiff's Objection to the Repurchase Claim

As the Court has determined that the Repurchase Claim (at this stage of the proceedings) is entitled to the presumption of *prima facie* validity, the Court must now determine whether it is plausible that the facts in the Amended Complaint, taken as true, rebut the *prima facie* validity of the Repurchase Claim.

Plaintiff claims that he met this burden by alleging that the aggregate value of the Purchase Securities is comprised of: (i) Barclays Capital's own valuation of the AAA Notes comprising a portion of the Purchased Securities; (ii) an independent DCF Analysis of the Remaining Notes comprising the Purchased Securities; (iii) July 2007 principal and interest payments received by Barclays Capital; and (iv) the Repo Cash

---

[62] *In re Chain*, 255 B.R. 278, 280 (Bankr. D. Conn. 2000) (emphasis added) (*citing Butner v. United States*, 440 U.S. 48 (1979) and *Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15 (2000)).

Collateral.  Plaintiff alleges that with respect to the aggregate value of the remaining

Notes, no commercially reasonable market existed for these securities as of the Repo

Termination Date, however a DCF Analysis is a commercially reasonable determinant

of value with respect to the Remaining Notes under the circumstances (especially when

considering that the market for these notes was inefficient, disrupted, dysfunctional or

non-existent at the time).

Barclays replies that as the non-defaulting party, Barclays is tasked with pricing

the securities and determining the method it would use at termination.  The Repurchase

Agreement states:

> Unless otherwise provided in Annex I [of the Repurchase Agreement], the parties acknowledge and agree that (1) the Securities subject to any Transaction hereunder are instruments trade in a recognized market, (2) **in the absence of a generally recognized source** for prices or bid or offer quotations for any Security, the nondefaulting party may establish the source therefore in its sole discretion . . . .[63]

It is not possible, at this stage, to determine whether there is an "absence of a generally

recognized source" to value the Securities.  This valuation is the subject of factual and

expert evidence – and is inappropriate to decide on a motion to dismiss.  Plaintiff need

not rebut the valid claim presumption in the Amended Complaint, but must make

*plausible* allegations that, taken as true, rebut the allegations set forth in the Repurchase

Claim.  Here, Plaintiff has alleged its theory of valuation of the Purchased Securities, the

calculations comprising that valuation, and what the commercially reasonable source

---

[63] Repurchase Agreement §11(d) (emphasis added).

(or commercially reasonable determinant) of value[64] – all of which, taken as true, are plausible factors to rebut the Repurchase Claim's valuation.    The Court finds that Plaintiff has alleged plausible facts and arguments that rebut the valid claim presumption.    As such, the Court denies the motion to dismiss Count VIII of the Amended Complaint.

## CONCLUSION

As stated above, the Court finds that "mutuality is an essential, definitional element of the right to setoff that must be strictly observed."[65]  For this reason and those stated above, Barclays is unable to exercise its (claimed) pre-petition right of triangular setoff as to the Swap Collateral.    As such, Barclays' motion to dismiss Counts I-VII of the Amended Complaint is denied.    Furthermore, the Court finds that Plaintiff has made plausible factual and legal allegations to rebut the *prima facie* validity of both the Repurchase Claim and the Swap Claim; as a result, the Court denies Barclays' motion to dismiss Counts VIII and IX of the Amended Complaint.    An order will be issued.

---

[64] Complaint at ¶¶ 21-25.

[65] *Lehman/UBS*, 458 B.R. at 144.